2009 UT 36

Tina ARCHULETA, Plaintiff and Appellant,

v.

ST. MARK'S HOSPITAL, Defendant and Appellee.

Nos. 20080580, 20080572.

Supreme Court of Utah.

May 14, 2010.

Rehearing Denied July 8, 2010.

---

6. *Supra,* ¶ 25.

7. *Supra,* ¶¶ 25, 27–28.

8. Utah Standards of Professionalism and Civility pmbl.

James R. Hasenyager, Peter W. Summerill, Ogden, for plaintiff.

Hugh C. Griffin, Mark A. Riekhof, Eric P. Schoonveld, Tawni J. Anderson, Salt Lake City, for defendant.

Paul M. Simmons, Salt Lake City, for amicus curiae.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 In this case, the district court improperly dismissed Tina Archuleta's negligent credentialing claim against St. Mark's Hospital on statutory grounds. We agree with Ms. Archuleta's argument on direct appeal that the plain language of Utah Code sections 58–13–5(7), 58–13–4, and 26–25–1 does not bar negligent credentialing claims brought by patients against health care providers. We reverse the district court's dismissal of Ms. Archuleta's negligent credentialing claim and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2 On August 4, 2005, Dr. R. Chad Halversen performed a laparotomy surgery on Ms. Archuleta at St. Mark's Hospital. Less than two days after being discharged from St. Mark's Hospital, Ms. Archuleta was admitted to McKay Dee Hospital complaining of severe pain and complications from the surgery. Over the course of the next year, physicians performed over six additional corrective surgeries on her.

¶ 3 Subsequently, Ms. Archuleta brought suit against Dr. Halversen and St. Mark's Hospital, among other defendants. In her First Amended Complaint, she asserted that St. Mark's Hospital "failed to seek consult when appropriate, inadequately trained healthcare provider employees, negligently credentialed ... [Dr.] Halversen and generally fell below the standard of care with regard to Plaintiff Tina Archuleta." St. Mark's Hospital moved to dismiss the negligent credentialing portion of the complaint, asserting that Utah does not recognize a cause of action for negligent credentialing.

¶ 4 The district court determined that Utah Code sections 58–13–5(7), 58–13–4, and 26–25–1 each independently barred a negligent credentialing cause of action. Accordingly, the court dismissed Ms. Archuleta's negligent credentialing claim. We have jurisdiction to review the district court's dismissal pursuant to Utah Code section 78A–3–102(3)(j) (2008), to review the district.

## STANDARD OF REVIEW

¶ 5 "[T]he purpose of a rule 12(b)(6) motion is to challenge the formal sufficiency of the claim for relief, not to establish the facts or resolve the merits of a case." *Whipple v. Am. Fork Irrigation Co.*, 910 P.2d 1218, 1220 (Utah 1996). Accordingly, a "12(b)(6) dismissal is a conclusion of law" that "we review for correctness." *Id.* "Also, 'a matter of statutory interpretation is a question of law that we review on appeal for correctness.'" *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 7, 211 P.3d 382 (quoting *MacFarlane v. Utah State Tax Comm'n*, 2006 UT 25, ¶ 9, 134 P.3d 1116) (alterations omitted).

## ANALYSIS

¶ 6 Because the district court dismissed Ms. Archuleta's negligent credentialing claim on statutory grounds, we examine the three statutes on which the district court based its decision. Since we determine that the plain language of the statutes does not bar the negligent credentialing claim, we need not address Ms. Archuleta's constitutional arguments. We also discuss our reasoning for recognizing a negligent credentialing cause of action in Utah.

### I. THE PLAIN LANGUAGE OF UTAH CODE SECTION 58–13–5 DOES NOT BAR NEGLIGENT CREDENTIALING CLAIMS

¶ 7 The plain language of Utah Code section 58–13–5 is clear. Read as a whole and in harmony with related provisions and chapters, it shows that the legislature did not intend to immunize hospitals from negligent credentialing claims brought by patients.

¶ 8 When faced with a question of statutory interpretation, "'our primary goal is to evince the true intent and purpose of the Legislature.'" *Duke v. Graham*, 2007 UT 31, ¶ 16, 158 P.3d 540 (quoting *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276). We do so by looking at the "best evidence of legislative intent, namely, the plain language of the statute itself." *Id.* (internal quotation marks omitted). As part of this "well-worn canon[ ] of statutory construction," we must read the plain language of the statute "as a whole." *Id.* (internal quotation marks omitted). Under this "whole statute" interpretation, *State v. Maestas*, 2002 UT 123, ¶ 54, 63 P.3d 621, we construe provisions "in harmony with other provisions in the same statute and 'with other statutes under the same and related chapters.'" *State v. Schofield*, 2002 UT 132, ¶ 8, 63 P.3d 667 (quoting *Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616). "We do so because '[a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious

whole.'" *Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 (quoting *Maestas*, 2002 UT 123, ¶ 54, 63 P.3d 621).

¶ 9 Section 58–13–5 addresses the dissemination of health care information. The statute compels a health care facility to report certain events—such as termination of employment or restrictions of privileges for cause, violations of professional standards or ethics, and findings of incompetency—that affect a licensed health care provider's practice or status. *See* Utah Code Ann. § 58–13–5(3)(a) to (h) (2007). To foster the dissemination of this information, the legislature grants three types of immunity. The first type is found in subsection 6(a), which provides, "[a]ny person or organization furnishing information in accordance with this section in response to the request of the [Division of Occupational and Professional Licensing] or a board, or voluntarily, is immune from liability with respect to information provided in good faith and without malice. . . ." *Id.* § 58–13–5(6)(a). The second type is found in subsection 6(b), which reads, "[t]he members of the board are immune from liability for any decisions made or actions taken in response to information acquired by the board if those decisions or actions are made in good faith and without malice. . . ." *Id.* § 58–13–5(6)(b). The third type exists under subsection 7, the subsection at issue in this case. Subsection 7 states,

> [a]n individual who is a member of a hospital administration, board, committee, department, medical staff, or professional organization of health care providers is, and any hospital, other health care entity, or professional organization conducting or sponsoring the review, immune from liability arising from participation in a review of a health care provider's professional ethics,

medical competence, moral turpitude, or substance abuse.

*Id.* § 58–13–5(7).

¶ 10 By its purpose and plain language, section 58–13–5 is a peer review statute. Indeed, this court has previously concluded that the plain language of similar statutes "indicates that their purpose is to protect health care providers who furnish information regarding the quality of health care rendered by any individual or facility." *Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069, 1078 (Utah 1991). Likewise, under the plain language of the statute, the legislature intended to immunize three classes of individuals from negligent credentialing claims brought by licensed health care providers— i.e., doctors. Subsection 6(a) provides immunity to those who furnish the information, subsection 6(b) shields those who make decisions in response to the information, and subsection 7 immunizes those who organize or sponsor the review of the information. This limited immunity is guaranteed so long as the acts are done without malice. *See* UCS 58–13–5. In short, the immunity contemplated under the statute operates between a doctor whose credentials are under review and the suppliers of information and decision makers; it does not contemplate immunity between a patient and a hospital.[1]

## II. THE PLAIN LANGUAGE OF UTAH CODE SECTION 58–13–4 DOES NOT BAR NEGLIGENT CREDENTIALING CLAIMS

■ ¶ 11 Utah Code section 58–13–4 grants immunity to health care providers that sponsor or make decisions regarding the proper use of facilities, the quality and cost of health care, ethical standards, or performance of services. *See* Utah Code Ann. § 58–13–4(2) (2007). The legislature, however, expressly excepted patients' claims regarding care. "This section does not relieve any

---

1. Utah Code section 26–25–3 (2007) provides that "[a]ll information, interviews, reports, statements, memoranda, or other data furnished by reason of this chapter, and any findings or conclusions resulting from those studies are privileged communications and are not subject to discovery, use, or receipt in evidence in any legal proceeding of any kind or character." While this provision prevents a patient from introducing this type of evidence in a negligent credentialing suit, there may still be a question of fact whether hospital administrators reasonably relied on the determination of the credentialing committee given independently available information.

health care provider from liability incurred in providing professional care and treatment to any patient." *Id.* § 58–13–4(3).

¶ 12 In its effort to discount the import of this exception, St. Mark's Hospital argues that "St. Mark's is not sued ... for 'providing professional care and treatment' .... Instead, St. Mark's is sued for its credentialing decisions with regard to Dr. Halversen prior to the time that Dr. Halversen provided the 'professional care and treatment' about which Plaintiff complains...." We reject this distinction. The credentialing determination is a decision regarding a doctor's fitness to provide patient care—and is clearly covered by the language of the exception that protects patients' claims regarding *provision* of that care. Ms. Archuleta's negligent credentialing claim is for alleged shortcomings in St. Mark's Hospital's review of Dr. Halversen's qualifications to provide treatment. Moreover, a negligent credentialing claim is not solely based on the qualifications of a health practitioner to provide treatment. The claim must also assert the element of damages. These damages arise from improper or substandard care. Claims of negligent credentialing and care, in the patient context, are thus not mutually exclusive.

¶ 13 Any argument that the exception provided in 58–13–4(3) should only apply to situations enumerated in that same section is also unavailing. This contention ignores the overlapping territory between St. Mark's Hospital's proposed broad reading of section 58–13–5 immunity and situations enumerated in section 58–13–4, which include: committee evaluations and determinations regarding the quality of health care; whether provided health care was necessary, appropriate or properly performed; ethical standards review; the diagnosis and treatment of patients within the state; etc. Subsection 58–13–4(3) indicates the legislature's intent to protect a patient's ability to recover damages from health care providers, despite the immunities provided. In discounting section 58–13–4(3), St. Mark's Hospital's reading would give the exception no effect. This is contrary to basic rules of statutory interpretation. *See State v. Jeffries*, 2009 UT 57, ¶ 9, 217 P.3d 265

("Statute[s] should be construed ... so that no part [or provision] will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another." (internal quotation marks omitted)).

## III. THE PLAIN LANGUAGE OF UTAH CODE SECTION 26–25–1 DOES NOT BAR NEGLIGENT CREDENTIALING CLAIMS

¶ 14 Finally, Utah Code section 26–25–1 bolsters this plain language reading of limited immunity. Section 26–25–1, similar to sections 58–13–4 and 58–13–5, grants immunity for "(a) providing information or material authorized in this section; (b) releasing or publishing findings and conclusions of groups referred to in this section to advance health research and health education; or (c) releasing or publishing a summary of these studies in accordance with this chapter." Utah Code Ann. § 26–25–1(5) (2007). We have noted,

> The purpose of th[is] statute[ ] is to improve medical care by allowing health-care personnel to reduce "morbidity or mortality" and to provide information to evaluate and improve "hospital and health care." Without the privilege, personnel might be reluctant to give such information, and the accuracy of the information and the effectiveness of the studies would diminish greatly.

*Benson v. I.H.C. Hosps., Inc.*, 866 P.2d 537, 539 (Utah 1993).[2] Again, under the plain language of this section, the legislature's grant of immunity relates to the dissemination of information, not to patient care. Indeed, as the court of appeals recognized, "the [statute] was never intended to shield hospitals from potential liability or to provide hospitals protection from medical malpractice claims." *Cannon v. Salt Lake Reg'l Med. Ctr., Inc.*, 2005 UT App 352, ¶ 23, 121 P.3d 74.

## IV. NEGLIGENT CREDENTIALING IS A VALID CLAIM IN UTAH

¶ 15 A "substantial majority of the other common law states" recognize negli-

**2.** This case was interpreting a previous version of   the statute, but the purpose remains the same.

gent credentialing as a viable claim. *Larson v. Wasemiller*, 738 N.W.2d 300, 306–309 (Minn.2007) (surveying states that have adopted negligent credentialing claims and the legal basis for the cause of action). We agree with the analysis that negligent credentialing is "simply the application of broad common law principles of negligence," *id.* at 307, and is a natural extension of torts such as negligent hiring. *Id.* at 308. There are strong policy reasons for recognizing the cause of action, including the foreseeability of harm to patients where hospitals fail to properly investigate a doctor's qualifications, *see Johnson v. Misericordia Cmty. Hosp.*, 99 Wis.2d 708, 301 N.W.2d 156, 164 (1981), and the " 'superior position [of hospitals] to monitor and control physician performance.' " *Domingo v. Doe*, 985 F.Supp. 1241, 1245 (D.Haw.1997) (quoting *Pedroza v. Bryant*, 101 Wash.2d 226, 677 P.2d 166, 169 (1984)). We therefore formally recognize negligent credentialing as a valid common-law cause of action in Utah.

## CONCLUSION

¶ 16 A comprehensive reading of section 58–13–5's language, in harmony with sections 58–13–4 and 26–25–1, demonstrates that the legislature did not intend to immunize negligent credentialing claims brought by patients. We also expressly hold that negligent credentialing is a valid common-law cause of action in Utah. We therefore reverse the district court's dismissal of the negligent credentialing claim and remand to the district court for further proceedings consistent with this opinion.

¶ 17 Justice PARRISH and Justice NEHRING concur in Chief Justice DURHAM's opinion.

DURRANT, Associate Chief Justice, dissenting:

¶ 18 I respectfully dissent. I agree in general with the majority's approach to statutory construction. I cannot agree with its conclusions about the plain language of the

relevant statutory provisions or with its analysis of how these immunity provisions interoperate with regard to the liability of health care providers in Utah. Specifically, I disagree with the majority's conclusions about the operation of Utah Code section 58–13–5.[1] Not only do I conclude that that statute's plain language reaches precisely the kind of claim advanced by Ms. Archuleta, I also disagree with the majority's reasons for concluding that it should only apply in the context of peer review. I believe that the majority's interpretation of the relevant statutes gives rise to inconsistencies between this grant of immunity and other related statutory provisions.

¶ 19 Ms. Archuleta also argues that the open courts and uniform operation of laws clauses of the Utah Constitution bar the legislature from enacting the kind of immunity asserted by St. Mark's in this case. Given that the majority holds that Ms. Archuleta is not precluded from bringing her claim, it is unnecessary for the majority to address these arguments. Because I would interpret Utah Code section 58–13–5 to confer immunity on St. Marks, I will also address the reasons I believe that the legislature did not violate the Utah Constitution in conferring this immunity.

## I. THE LEGISLATURE HAS GRANTED HEALTH CARE PROVIDERS IMMUNITY FROM CLAIMS FOR THE NEGLIGENT CREDENTIALING OF PHYSICIANS

¶ 20 Of the three grants of immunity St. Marks invokes in this case, the broadest is found at Utah Code section 58–13–5(7). This section states that

(7) An individual who is a member of a hospital administration, board, committee, department, medical staff, or professional organization of health care providers ..., and *any hospital*, other health care entity, or professional organization conducting or sponsoring the review, [is] *immune from liability arising from participation in a*

---

1. The majority also concludes that the grants of immunity found in Utah Code section 58–13–4 and 26–25–1 do not shield hospitals from negligent credentialing claims. Because I conclude

that section 58–13–5 would confer sufficient immunity to shield St. Marks in this case, I do not address whether these other statutory provisions also shield the hospital.

*review of a health care provider's professional ethics, medical competence, moral turpitude, or substance abuse.*[2]

The reviews described by section 58–13–5(7) constitute precisely the sort of credentialing review for which Ms. Archuleta suggests liability can be imposed. Specifically, Ms. Archuleta describes the term "negligent credentialing" as a form of "short-hand" for the breach of a duty that arises when a hospital "undertakes . . . to render services to another which [it] should recognize as necessary for the protection of the other." [3] Ms. Archuleta does not claim that St. Mark's is liable under the doctrine of respondeat superior. That is, she does not contend that Dr. Halversen was an employee of the hospital for whose actions the hospital is vicariously liable. Rather, she claims that St. Mark's was independently negligent in permitting Dr. Halversen to use its facilities.[4]

¶ 21 In other words, her allegation of negligent credentialing is based on alleged shortcomings in the hospital's review of Dr. Halversen's qualifications to provide treatment.[5] This is exactly the kind of liability that the plain language of the statute addresses. Put differently, Ms. Archuleta seeks to hold St. Marks liable for harms that allegedly arose "from participation in a review of a health care provider's . . . medical competence."

¶ 22 Ms. Archuleta argues, and the majority concludes, that section 58–13–5(7) grants immunity only from suits brought by "fellow professionals" who were the subject of the credentialing review. But this statute simply does not contain this limitation. Section 58–13–5(7) broadly provides that individuals "participat[ing]" in a review of a health care provider's . . . medical competence" are "immune from liability." Nothing in the plain language of 58–13–5(7) suggests that the scope of immunity granted is in any way dependent on who brings the suit.

¶ 23 The majority does not explain how this statutory language fails to reach the claims advanced by Ms. Archuleta. Rather, the majority concludes that this language does not apply to negligent credentialing claims because other portions of Utah Code section 58–13–5 apply only in the context of peer review.

¶ 24 In support of this argument, the majority refers to the other two grants of immunity contained in this section. One of these grants of immunity shields individuals who provide information to the Division of Professional Licensing ("DOPL").[6] The other grant of immunity shields members of a DOPL board from suits based on "decisions made or actions taken in response to information acquired by the board." [7] The majority states that, because of the nature of these grants of immunity, the entire section contemplates only immunity "between a doctor whose credentials are under review and the suppliers of information and decision makers; [not] immunity between a patient and a hospital." [8]

---

**2.** Utah Code Ann. § 58–13–5(7) (2007) (emphasis added). The grant of immunity conferred by this statute in no way alters the credentialing and licensing requirements imposed on hospitals and physicians by the Utah Department of Health and the Division of Professional Licensing. *See* Utah Code Ann. §§ 58–1–106, 58–67–201(3)(b) (authorizing the Division of Professional Licensing to suspend or revoke licenses of physicians engaged in unprofessional conduct); Utah Admin. Code R. 432–2–9, –3–6 (requiring hospitals to adopt review procedures approved by the Department of Health and authorizing sanctions for hospitals that fail to comply).

**3.** Appellant Br. at 15 (quoting Restatement (Second) of Torts § 323 (1965)).

**4.** St. Mark's concedes that if Ms. Archuleta could prove that an agent or employee of St. Mark's negligently provided care or treatment, St. Mark's could be held liable under traditional principles of respondeat superior.

**5.** Utah Code section 26–49–204(1)(a) (Supp. 2009) defines "credentialing" as "obtaining, verifying, and assessing the qualifications of a health practitioner to provide treatment, care, or services." This definition, like the characterization advanced by Ms. Archuleta, suggests that any claim for negligent credentialing will fall squarely within the immunity contemplated by section 58–13–5(7) as a "review of a health care provider's . . . medical competence."

**6.** Utah Code Ann. § 58–13–5(6)(a).

**7.** *Id.* § 58–13–5(6)(b).

**8.** *Supra* ¶ 10.

¶ 25 In my view, this conclusion regarding the scope of subsection 58–13–5(7) simply does not follow from the majority's interpretation of subsections 58–13–5(6)(a) and (6)(b). First, the majority's analysis is based on an inference that is neither apparent from, nor commanded by, the words of the statute. Further, the majority's · conclusion depends on an extrapolation that does not logically follow from that initial inference. The majority has isolated subsections (6)(a) and (6)(b) of section 58–13–5 and reasoned that, because physicians are the likely plaintiffs in the lawsuits contemplated by those subsections, they are necessarily the only plaintiffs whose suits are precluded by the section as a whole. But these subsections do not contain any language that might limit them in this way, so this inference is questionable.

¶ 26 Regardless of the flaws in this initial premise, I do not believe the next step in the majority's reasoning withstands scrutiny. Even if the grants of immunity in subsections (6)(a) and (6)(b) should apply only to suits brought by physicians, the grant of immunity relevant for purposes of this case—the immunity set forth in subsection (7)—is directed at a different class of activity. Subsections (6)(a) and (6)(b) address the immunity enjoyed by DOPL board members and individuals who share information with a DOPL board. They grant immunity for "furnishing information" and for "decisions made or actions taken." They simply do not address the immunity that protects hospitals from liability arising from "participation in a review of a [physician's] medical competence." Instead, this immunity is set forth in subsection (7). And although subsection (7) is related to subsections (6)(a) and (6)(b), this fact does not require that limitations from one subsection be applied to another. That these different subsections address different sorts of lawsuits and different categories of potential defendants militates against such an assumption.

¶ 27 The legislature separated the immunity contained in subsection (7) from the immunity relevant to DOPL reviews set forth in subsection (6). It used different operative language to define its scope. It directed the grants of immunity at different classes of potential defendants and different categories of activity. Yet, regardless of these differences, the majority urges that, simply because subsections (6)(a) and (6)(b) apply only when physicians bring suit, subsection (7) must *necessarily* be interpreted to contain a similar limitation. In my opinion, this extrapolation is logically flawed and inconsistent with the broad language used in subsection (7).

¶ 28 Further, the lack of an express limitation on the scope of immunity is important because related statutes make it clear that similar limitations—when the legislature intends to create them—are made explicit. For instance, section 58–13–3(3) grants, to both hospitals and physicians, immunity that is explicitly limited to "medical malpractice action[s]." Section 58–13–2.6(2)(a) grants similar immunity that is explicitly limited to civil damages resulting from "assist[ing] governmental agencies" with specific, enumerated health care activities.[9] And section 58–13–4(3), which grants immunity for decisions made by certain peer review committees, limits that immunity by explicitly excepting claims for "liability incurred in providing professional care and treatment to any patient."

¶ 29 These sections make it clear that when the legislature has intended to confine the immunity it creates it has done so with statutory language limiting the scope of the immunity to specific causes of action and factual scenarios. The absence of any such language in section 58–13–5(7) is a strong indication that the legislature intended to impose no limitations other than those made explicit by the statutory language. This reinforces what is plainly stated in this section—no liability may be imposed on a hospital because of its participation in a review of a physician's medical competence.

¶ 30 The majority limits these subsections to a narrow subset of potential liability in an

---

**9.** The activities for which immunity is granted are responding to state, local, or national health emergencies, responding to threats of bioterrorism, responding to an epidemic, or making a health care facility available for use in distributing pharmaceuticals or administering vaccines. *See* Utah Code Ann. § 58–13–2.6(2)(b).

attempt to construe these statutory provisions "in harmony with other provisions in the same statute and with other statutes under the same and related chapters."[10] However, the purpose for employing this canon of construction is to "produce a harmonious whole."[11] In general, I question the appropriateness of disregarding plain statutory language in an attempt to construct a harmonious whole. But in this case, I find it especially inapt because the majority's interpretation of the statute is inconsistent with other portions of the code.

¶ 31 First, although section 58–13–5 relates to liability arising from information sharing and review of a physician's competence, the other provisions in this chapter of the Utah Code set forth multiple grants of immunity related to other activities. Some create immunity from liability for providing charitable care while others create immunity from liability when providing certain emergency services.[12] Reading this chapter of the Utah Code as a whole, the only valid bases I can find for limiting the various kinds of immunity conferred are the bases contained in the text. For example, section 58–13–4 creates immunity for the work done by certain committees, and it contains an exception for suits regarding "professional care and treatment."[13] Unlike in section 58–13–5, the use of an explicit exception indicates that the legislature specifically considered whether the immunity provided would preclude suits by patients and explicitly provided that it would not. Indeed, every other grant of immunity in this chapter clearly contemplates suits by patients. Under the majority's interpretation, only in section 58–13–5 is it necessary to infer such a limitation from language that is not included in the statute. Given the legislature's clear ability to craft

these limitations when it so intends, I would not construe the statute in a way that makes it necessary to impose such a limitation in a section where the legislature did not do so.

¶ 32 Second, the majority's interpretation of section 58–13–5 is inconsistent with a legislative mandate that information provided to a peer review committee not be used in court proceedings. Specifically, section 26–25–3 provides that when information regarding patient treatment and care is provided to a peer review committee, that information is deemed to be a "privileged communication[ ]" that is "not subject to discovery, use, or receipt in evidence in any legal proceeding of any kind or character."[14] Indeed, a violation of this restriction is a class B misdemeanor.[15] This section—which erects potentially insurmountable barriers to judicial resolution of negligent credentialing claims—is at the very least inconsistent with the notion that section 58–13–5 preserves an exception, sub silentio, for claims of negligent credentialing. A much more harmonious reconciliation of these provisions recognizes that the need to use this sort of information in court proceedings is obviated by the grant of immunity contained in section 58–13–5(7).

¶ 33 Third, the majority's interpretation carries with it a troublesome corollary. Because it asserts that the immunity conferred in section 58–13–5 does not contemplate immunity from patient suits, its interpretation would not protect members of the DOPL board who make licensing decisions from suits by patients of the physicians who were licensed by the board.[16] Nor would it protect individuals who, in good faith, provide information to the DOPL board from such suits. Given the majority's proposition that the whole of section 58–13–5 applies only to suits by physicians, there is no apparent

10. See State v. Schofield, 2002 UT 132, ¶ 8, 63 P.3d 667 (internal quotation marks omitted).

11. Berneau v. Martino, 2009 UT 87, ¶ 12, 223 P.3d 1128 (internal quotation marks omitted).

12. See Utah Code Ann. § 58–13–2 to –3.

13. Id. § 58–13–4(3).

14. Id. § 26–25–3 (2007).

15. Id. § 26–25–5.

16. Utah Code section 63G–7–301(5)(c) (2008) apparently retains traditional governmental immunity for actions taken by DOPL boards in issuing, denying, suspending, or failing to suspend or revoke licenses. Although this would appear to render section 58–13–5(6)(b) superfluous, I nevertheless find it inconsistent that the legislature would enact this specific DOPL-oriented grant of immunity but silently preserve an exception that would permit patient suits.

basis for construing subsection (6)(a) and (6)(b) to preclude patients from pursuing their claims against DOPL board members and individuals who share information with the DOPL board. In the absence of any statutory language indicating that the immunity in these sections applies only to suits by physicians, it is far more consistent to interpret each subsection to grant immunity to hospitals, DOPL board members, and DOPL informants, regardless of who brings the suit. Any other interpretation inserts into the statute exceptions that simply cannot be found in the statute's plain language.

## II. GRANTING STATUTORY IMMUNITY FROM NEGLIGENT CREDENTIALING CLAIMS DOES NOT VIOLATE THE UTAH CONSTITUTION

¶ 34 Ms. Archuleta contends that if Utah's current statutory scheme bars negligent credentialing claims, then the scheme violates the open courts and uniform operation of laws clauses of the Utah Constitution. With regard to the open courts clause, she asserts that the grant of immunity is unconstitutional because it abrogates a common law right without creating an alternative remedy and that public policy does not support the abrogation. With regard to the uniform operation of laws clause, Ms. Archuleta argues that this grant of immunity has the effect of treating similarly situated individuals differently. I will address each of these arguments in turn.

### A. This Grant of Immunity Does Not Violate the Open Courts Clause of the Utah Constitution

¶ 35 The legislative grant of immunity from negligent credentialing claims does not violate the open courts clause because there is a reasonable alternative remedy to such a

cause of action. The open courts clause of the Utah Constitution provides as follows:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.[17]

¶ 36 Before legislation implicates the open courts clause, the legislation must abrogate an existing right of action in whole or in part.[18] But even legislation that abrogates an existing right of action does not violate the open courts clause when "an injured person [has] an effective and reasonable alternative remedy 'by due course of law' for vindication of his constitutional interest." [19] A remedy is "an effective and reasonable alternative" to the abrogated cause of action so long as the benefit provided by the alternative remedy is "substantially equal in value or other benefit to the remedy abrogated." [20] The open courts clause is satisfied in this case because a suit directly against the doctor for his own negligence is a reasonable alternative remedy.

¶ 37 The true harm that a patient suffers in this type of case is the injury resulting from the physician's negligent actions. If the physician had not performed the surgery negligently, there are no damages a patient could seek based solely on the assertion that the physician may have been negligently credentialed. Accordingly, I would hold that a reasonable and effective alternative to a claim for negligent credentialing exists in the form of a negligence action against the doctor whose alleged negligence caused the plaintiff's actual injury.

---

17.  Utah Const. art. I, § 11.

18.  *Tindley v. Salt Lake City Sch. Dist.,* 2005 UT 30, ¶ 17, 116 P.3d 295. Although it may have been unclear until decided by the majority in this case, I am willing to assume that a claim for negligent credentialing was an existing right within the meaning of our precedent to the extent that it "is 'simply the application of broad common law principles of negligence.'" *See supra* ¶ 15 (quoting *Larson v. Wasemiller,* 738 N.W.2d 300, 307 (Minn.2007)).

19.  *Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 680 (Utah 1985).

20.  *Id.*

*B. This Grant of Immunity Does Not Violate the Uniform Operation of Laws Clause of the Utah Constitution*

¶ 38 The uniform operation of laws clause of the Utah Constitution provides that "[a]ll laws of a general nature shall have uniform operation."[21] "A law does not operate uniformly if 'persons similarly situated' are not 'treated similarly' or if 'persons in different circumstances' are 'treated as if their circumstances were the same.'"[22] Ms. Archuleta contends that "construing the statutes to eliminate negligence claims premised on credentialing while allowing other claims based on different bases for negligence ... offends" the uniform operation of laws clause.

¶ 39 Ms. Archuleta is incorrect. The uniform operation of laws clause requires only that similarly situated individuals be treated similarly, not that similar claims be treated the same. And the statutory scheme treats all persons equally. All persons with a negligent credentialing claim are barred from bringing the claim. If the uniform operation of laws clause were to operate as Ms. Archuleta suggests, all statutes that grant tort immunity would be unconstitutional for failing to bar—or permit—all tort actions. The uniform operation of laws clause does not require this type of all-or-nothing approach to a delicate and nuanced problem. Accordingly, I would conclude that the legislature's grant of immunity from negligent credentialing claims does not violate the uniform operation of laws clause.

### CONCLUSION

¶ 40 Ms. Archuleta seeks to recover from St. Mark's Hospital for harm allegedly caused by a physician working in the facility. She asserts that the hospital should be held liable for exercising substandard care when reviewing that physician's competence to practice medicine. The majority concludes that the claim is not barred by the Health Care Providers Immunity from Liability Act, even though that act includes a provision that makes hospitals "immune from liability arising from participation in a review of a health care provider's ... medical competence." I am unpersuaded by the majority's argument that an exception should be read into this plainly stated grant of immunity. Accordingly, I dissent.

¶ 41 Justice WILKINS concurs in Associate Chief Justice DURRANT's dissenting opinion.

---

21. Utah Const. art. I, § 24.

22. *Lee v. Gaufin,* 867 P.2d 572, 577 (Utah 1993) (quoting *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984)).